# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 24, 2023

Lyle W. Cayce
Clerk

_____

No. 22-20380

_____

Jason January,

*Plaintiff—Appellant*,

*versus*

City of Huntsville,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-303

_____

Before Jones, Clement, and Haynes, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

In this employment retaliation case, we AFFIRM the judgment of the district court.

## I

Almost a decade ago, Huntsville, Texas firefighter Jason January had gallbladder surgery. It did not go well, and ever since, January has needed medication and treatment for complications. And for years, both the City and its fire department accommodated him.

But in 2016, not long after his surgery, the City caught January asking a fellow employee for his leftover prescription painkillers. Because such a request violated city policy, Huntsville placed January on probation, and warned that future violations could lead to his termination.

Unrelatedly, in January 2018, January submitted—and then rescinded—a letter of resignation. The fire department accepted him back, but passed him over for open officer positions, and declined to reinstate him to a trainer position he'd previously held. January, incensed, met with City employees in November 2018. At that meeting, he accused the City of discriminating and retaliating against him on account of his age and disability in not selecting him as an officer and by removing him as a trainer. He also made clear that he was considering suing the City for discrimination. The City, with the help of outside counsel, began to investigate. After several months without resolution, January, in February 2019, told the City that he was going to complain to the EEOC.

Then, a month later, January went to Huntsville's City Hall to make copies for his EEOC complaint. The parties tell different tales of how that visit went. Per the City, employees immediately suspected that January was somehow intoxicated. Employees reported that January slurred his words, was "partially incoherent," and seemed unlike himself. Despite that, Brenda Poe, the city secretary, helped January make his copies. But according to her, that did not go well—January, she said, boxed her in and blocked the copy room exit, stating all the while that "when all of this comes out, they're going to be sorry that they messed with me." Poe, feeling threatened, escaped past him when she could and ran to hide in the women's bathroom nearby.

January tells it differently. On the day in question, he claims he was suffering from sleep deprivation and hypoglycemia (which, he notes, he'd told the City months before could read as intoxication). And when he went

to the copy room with Poe, he did not box her in, but rather stood patiently as he waited for his copies. Further still, his comment that Poe took as threatening was directed at the *City* with regards to his lawsuit, not to *Poe* in particular.

No matter the cause, January eventually went to the City Manager's office with several City officials. While there, officials repeatedly asked to drug test January, which he declined to allow. Officials refused to let January drive himself home and finally let him go only when his wife eventually arrived.

The City placed January on administrative leave and investigated. Two weeks later, it fired him. Director of Public Safety Kevin Lunsford, the decisionmaker, explained that January was fired because: 1) despite a drug test taken the next day showing no intoxication, there remained a "high probability" that January was impaired at City Hall; 2) January was insubordinate because he refused to leave City Hall when told to do so; 3) January's lack of cooperation and intoxication harmed the City's reputation; and 4) January was disrespectful in intimidating and scaring Poe. Given January's past warning that any further violation could end his employment, the City terminated him. And, at roughly the same time, it informed January that the investigation into his discrimination complaint determined that it lacked merit.

January sued, claiming retaliation under the ADA, the Rehabilitation Act, and the ADEA, and discrimination under the ADA. Eventually, and over January's request for a Rule 56(d) continuance, the district court granted summary judgment to the City on all claims. January now appeals both his denied continuance and the City's summary judgment.

## II

We review the district court's denial of a Rule 56(d) motion for abuse of discretion. *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (per curiam). The district court "has broad discretion in all discovery matters, and such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (quotations and citation omitted). Additionally, we review a grant of summary judgment de novo, applying the same standards as the district court. *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018). A "court should grant summary judgment when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(a)).

### A

First, January's Rule 56(d) motion. Per Rule 56(d), a district court may defer or deny a summary judgment motion, or allow additional time for discovery, if a "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." FED. R. CIV. P. 56(d). To win on his motion, January must "show (1) why [he] needs additional discovery and (2) how that discovery will create a genuine issue of material fact." *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001). It's not enough to "simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Biles*, 714 F.3d at 894 (quotations and citation omitted). Instead, he "must set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)

(quotations and citation omitted). He "must also have diligently pursued discovery." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 816 (5th Cir. 2017) (quotations and citation omitted).

Discovery here closed on March 2, 2022, after two jointly requested extensions totaling almost five months. On March 10—over a week past the close of discovery—January submitted a letter to the court asking for a discovery conference.[1] In his letter, he listed his outstanding issues: discovery concerning city secretary Brenda Poe; the city's hired outside investigator and his investigation; January's emails, texts, and Open Records Act request correspondence; and whether the City believed January's transcript of his Texas Worker's Commission hearing was correct. He followed up by email twelve days later.

The issue lay dormant for almost two months. But once the City moved for summary judgment, January again raised it in response. The court should "defer consideration" of Huntsville's motion, said January, because "there is an ongoing discovery dispute." He insisted that the "information sought in discovery is germane to the issues raised in the [summary judgment] motion." So, "[i]f the Court believe[d] that the motion ha[d] any merit," January implored it to defer pursuant to Rule 56(d). Attached was a declaration by his attorney, again listing the items sought and explaining that "[a]ll of this information is likely to be relevant to the case and specifically to the summary judgment motion." The district court treated this request as an "eleventh hour" Rule 56(d) motion and denied it. It faulted January for

---

[1] This letter was sent pursuant to Judge Rosenthal's internal procedures, which require parties to request conferences before filing motions to compel.

"fail[ing] to specify which 'facts' he is unable to present due to the lack of requested materials and why they are 'essential' to his opposition.'"[2]

We agree. Before the district court, January did little more than *suggest* that the court defer ruling on summary judgment until the discovery issues were resolved. January's initial letter only lists the items he still seeks. When he later raised the issue again, he said only that the sought evidence "is *likely* to be relevant to the case and specifically to the summary judgment motion," and is "germane to the issues raised" there.

That isn't enough. January's list of items *sought* isn't the same as identifying the *facts* those items will support. *See Mendez v. Poitevent*, 823 F.3d 326, 337 (5th Cir. 2016) ("Plaintiffs did not, moreover, identify specific facts below that would alter the district court's analysis."). January needed to show "*how* the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Raby*, 600 F.3d at 561 (emphasis added) (quotations and citation omitted). His motion "did not meet even this unexacting standard," *Renfroe v. Parker*, 974 F.3d 594, 601 (5th Cir. 2020), but rather relied only "on vague assertions that additional discovery will produce needed, but unspecified facts," *Biles*, 714 F.3d at 894 (quotations and citation omitted).

Because January didn't explain "how that discovery will create a genuine issue of material fact," *Beattie*, 254 F.3d at 606, he didn't carry his burden.[3] The district court thus acted well within its "broad discretion" to deny his motion.

---

[2] Though we do not address it, the district court also concluded January failed to show he diligently pursued discovery.

[3] Though January *now* explains what his sought items would show and how they'd affect summary judgment, he didn't before the district court. We therefore don't consider his explanations now. *See Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 535 (5th

No. 22-20380

**B**

And now to the merits. January asserts claims of retaliation under the ADA, the Rehabilitation Act, and the ADEA.[4] All three prohibit an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the Acts] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the Acts]." 42 U.S.C. § 12203 (ADA); *see also* 29 U.S.C. § 794(d) (incorporating the ADA's standard for Rehabilitation Act claims); 29 U.S.C. § 623(d) (ADEA).

Since January admits only circumstantial evidence of retaliation, to succeed on his claims he must satisfy the burden-shifting *McDonnell Douglas* test. *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). First, he must make out a *prima facie* case by showing (1) engagement in protected activity, (2) an adverse employment action, and (3) a causal connection between the two. *Id.* at 348–49. If he does so, the City must come forward with a legitimate, non-discriminatory reason for the adverse action. *Id.* Once it does, January must then show "sufficient evidence that the proffered reason is a pretext for retaliation." *Id.* at 349 (quotations and citation omitted). The parties contest only whether January established a causal connection between

---

Cir. 1999) ("On appeal, we will not consider justifications for granting a continuance that were not presented with the original motion."); *Mendez*, 823 F.3d at 337 n.8 (same).

[4] January also asserted an ADA discrimination claim. The City argues that he abandoned that claim as well as his ADEA retaliation claim through inadequate briefing. We agree as to the former. January "fail[ed] to cite a single authority supporting such a claim; thus, [his] argument is abandoned." *N.Y. Party Shuttle, L.L.C. v. NLRB*, 18 F.4th 753, 765 n.4 (5th Cir. 2021). As to the latter, however, it's clear that January briefed all his retaliation claims—under the ADA, the Rehabilitation Act, and the ADEA—*together* for convenience, citing authorities that refer to all three interchangeably. That's sufficient, and so we therefore address January's ADEA retaliation claim on the merits.

his acts and his termination, and whether he showed sufficient evidence that the City's proffered legitimate reason for his firing was pretextual.

The court below first concluded that January did not establish a causal connection because he failed to show that Lunsford "knew that [he] intended to file charges with the employment commissions when" he was fired. That doomed January's *prima facie* case.

But as January rightly argues, that was error: the short time between his protected acts and his firing is *itself* enough to show causation. While generally, a causal link "is established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Nall*, 917 F.3d at 349 (quotations and citation omitted), it can also "be established simply by showing close enough timing between the two events." *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019). We've repeatedly held periods of a few months sufficient to satisfy causation in a *prima facie* case. *See, e.g.*, *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 219 (5th Cir. 2016) (holding two months sufficient to show causal connection); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (suggesting "a time lapse of up to four months has been found sufficient to satisfy the causal connection" (quotations and citation omitted)).

Here, a mere six weeks passed between January's second protected activity (telling the City Manager he was going to file an EEOC complaint) and his firing. That gap does the trick. *See Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 949 (5th Cir. 2015) ("[T]he six-and-a-half-week timeframe between [the protected act] and the [adverse action] is sufficient to satisfy the prima facie case of causation."). January successfully demonstrates a *prima facie* case of retaliation.

Moving on, January does not contest that the City produced legitimate, non-retaliatory justifications for his firing. So, he must then show the City's reasons—several city policy violations in March 2019—were mere pretext. The district court found that he failed to do so because the record supported Director Lunsford's explanation. First, it explained that Lunsford concluded that there was "a high probability that [January] was impaired" after reference to another officer's lengthy investigation report. That officer, noted the court, interviewed nine people, including January, and had over two decades' familiarity with January. Next, it explained that even if January believed he wasn't being insubordinate, he nevertheless failed to point to any evidence that Lunsford said he was subordinate only as pretext. Then, it found that the record showed Poe (the city secretary) believed January was acting in a threatening manner towards her and so it was reasonable for Lunsford to act on that belief. And finally, it said there was nothing wrong with the city issuing January an initial complaint, and then including additional policy violations after an investigation. At base, the City had merely "warned January . . . that additional policy violations would result in termination," and then "acted consistently with that warning." January's claim therefore failed.

To survive summary judgment now, January must show that his protected act "was a 'but for' cause of" his termination. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022) (quotations and citation omitted). He can do so by "produc[ing] substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015) (quotations and citation omitted). His evidence is substantial if it "is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* (quotations and citation omitted). He must rebut "each discrete reason

proffered by" the City. *Id.* The panel is to consider "numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1002 (5th Cir. 2022) (quotations and citation omitted).

January first chides the district court for not crediting how close in time his protected activity and his termination were. While "temporal proximity standing alone is insufficient to establish an issue of fact as to pretext after an employer has provided a non-retaliatory reason," *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 487 (5th Cir. 2008), January is right that the "combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment," *Burton*, 798 F.3d at 240 (quotation and citation omitted). January came to the city hall to copy documents *for his EEOC charge*—a fact everyone knew—and was fired only fifteen days later. This sequence, says January, "is a strong indicator of pretext." And he's right—we've indeed credited similar timelines as indicative of pretext. *See, e.g.*, *Burton*, 798 F.3d at 240 (finding an inference of pretext in a "roughly two week[]" gap). So, the district court erred by failing to credit the temporal proximity between January's protected act and his termination as evidence of pretext.

Beyond this temporal proximity, January produces scant *evidence* of pretext and retaliation.[5] But it is not per se required that he do so. Indeed,

---

[5] He does argue that because his termination memorandum had more grounds for dismissal than the City's initial complaint against him did, it violated Texas law. This, he says, is further evidence of pretext. But nothing in his chosen code section requires the complaint to state *every eventual grounds* for dismissal, and nothing there forbids the City from uncovering more reasons for termination throughout an investigation. *See* Tex.

"in an appropriate case, a factfinder may infer the ultimate fact of retaliation from the falsity of the employer's explanation." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577–78 (5th Cir. 2020) (cleaned up). In those situations, "a plaintiff may withstand a motion for summary judgment without adducing additional, independent evidence of retaliation." *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002). Even so, though, January's "evidence of falsity must be of sufficient nature, extent, and quality to make the inferential leap to [retaliation] a rational one." *Owens*, 33 F.4th at 826 n.7 (quotations and citation omitted).

January makes the same thrust: that the City's reasons are "unworthy of credence" and therefore pretextual. He challenges the City's reasons beat-by-beat rather than leading the panel to separate evidence of pretext.

We've made clear though that merely showing a reason is *false* is not enough. For example, in *Owens*, we held that even though the plaintiff "ha[d] provided enough evidence to permit a finding that [the employer's] proffered justification for her termination [wa]s false" she failed to present more than a "mere scintilla of evidence that the true reason for her termination was discriminatory animus." 33 F.4th at 834. So even though the plaintiff provided "[s]everal declarations [that] attest[ed] to specific facts which, if credited by a factfinder, could lead to a reasonable rejection of [the employer's] proffered reason for firing" her, "that alone [wa]s not enough." *Id.* at 831–33. She needed her evidence of falsity to be colored with shades of *pretext*; failing that, her claims couldn't proceed. *Id.* at 834–35.

By contrast, in *Gee*, we held that the plaintiff successfully demonstrated pretext when she showed that the reasons given for her

---

GOV'T CODE § 614.023. January doesn't cite anything that shows the City did something wrong in that regard.

adverse employment action were shifting and inconsistent. 289 F.3d at 347–48. She also showed that the reasons given flatly contradicted the glowing reviews she received just prior. *Id.* at 348. These contradictions and fluid justifications tended to show that the reasons given were false and thus sustained an inference of pretext sufficient to defeat summary judgment. *Id.* Too, in *Staten v. New Palace Casino, LLC*, we explained that the employer's "inconsistent explanations for [plaintiff's] termination and the timing of its changing rationale" indicated the justification was false, and therefore pretextual. 187 F. App'x 350, 359 (5th Cir. 2006) (per curiam). Before the EEOC and then in the later litigation, the employer took different positions for why the plaintiff was terminated. *Id.* at 358–60. That it could not nail down a reason during the contentious time was sufficient evidence of pretext. *Id.* at 360.

With that principle in mind, we turn back to January. As for his alleged intoxication, January starts by pointing to an officer bodycam video of his visit to city hall. In this video, he claims he "looks just fine," with "normal" speech, "rational" discussions, steady walking, and repeated denials that he'd taken medication.

Beyond the last assertion, those are subjective conclusions. Without any other video of January, it's impossible to conclude what's "normal" for him. In the City's video, he appears to be conversing rationally, but often hesitates to respond and seems to drag out sentences and stumble over his words. What the video does show is that several officials told January that he seemed to be having an issue beyond a mere "lack of sleep," and repeatedly requested that they be allowed to check him for signs of chemical influence. While January declined time and again and insisted he was fine, the video does little to dispel any impression that officials on the scene believed to the contrary. Officials told January and his wife that, given their familiarity with him, he did not seem himself. One listed to January's wife the behaviors that

concerned him: slurred and misspoken words, failure to comprehend things, and glassy eyes. And January also overstates whether the video shows him "look[ing] just fine"—thanks to the camera's angle, we see only fleeting glimpses of him. Indeed, when he gets up to leave, he is shown for little more than six seconds. The video does not show him walking out or how he gets to his wife's car. All told, the video does not cast doubt on Lunsford's conclusions and provides no evidence that his conclusion was pretextual.

January points out that he reasonably declined a "subjective" "gaze test" and a non-standard urine screen that would have been administered *by Lunsford*, and that Lunsford administered no other drug test. While that's true, and maybe even prudent, it is not evidence that Lunsford's reasons for terminating January were pretextual. Lunsford didn't fire January for *failing* a drug test. He fired January because, after an investigation that interviewed nine people, Lunsford concluded there was "high probability that [January was] impaired."

January next notes that he'd told the City months before that his disability sometimes causes his blood sugar to drop, which causes him to "appear intoxicated." And when he appealed Lunsford's decision, he explained that he was hypoglycemic at the time, which was (he suggested) "misperceived as intoxication." But January fails to connect that knowledge to *Lunsford*—only to separate city officials. He also fails to demonstrate any actual *evidence* that he was suffering from hypoglycemia that day—he merely claims it so. That he told a different employee months before that he sometimes gets low blood sugar and can appear intoxicated is not *evidence* that Lunsford's decision was pretextual or false.

January next points to a drug test he took the next day that cleared him. But as the district court explained, nothing about a drug test the following day "proved that January was not intoxicated or under the

No. 22-20380

influence of a substance the day before." And finally, January claims the reference to his 2016 incident was mere "grasping at straws," since he was not intoxicated back then. But that incident still involved asking for prescription painkillers, and it was opioids that Lunsford suspected January to be on. Calling the reference a mere straw grasp dramatically downplays the 2016 incident's clear relevance. And besides, in 2016 January was warned that another policy violation could result in termination, which it here did.

All told then, beyond temporal proximity, January produces no evidence that Lunsford's reasoning concerning his intoxication was false (such that he was not actually intoxicated at the time) or pretextual (such that January's protected activities were the real reason for his firing). We have said temporal proximity isn't enough. Nothing January provides "make[s] the inferential leap to [retaliation] a rational one." *Owens*, 33 F.4th at 826 n.7 (quotations and citation omitted). Because he failed to rebut this proffered justification for his termination, summary judgment was proper.[6]

## III

The district court is AFFIRMED.

––––––––––––––––––––––––––––––

[6] And because we conclude January did not successfully rebut the City's claims of his intoxication, we do not address the other proffered reasons.

HAYNES, *Circuit Judge*, concurring in part, dissenting in part:

I concur with some of the majority opinion's analysis, as well as its ruling on January's disability discrimination claim. However, I respectfully dissent as to its conclusions regarding January's retaliation claims, as to which I would reverse the summary judgment. While I wouldn't need to reach his Rule 56(d) motion, given the majority opinion's conclusion on the retaliation claim, I disagree with its affirmance of the Rule 56(d) motion.

## I. Retaliation

I first address the majority opinion's assessment of January's retaliation claims and its conclusion that summary judgment on those claims was proper. I agree that January satisfied the requirements for a prima facie retaliation case. *See* Majority Op. at 7–9. I will assume arguendo that Huntsville produced at least one legitimate, non-retaliatory reason for his firing, which then takes me to January having the burden of raising a genuine dispute of material fact as to whether those reasons were pretextual. *See* Majority Op. at 9. However, I diverge from the majority opinion's conclusions on pretext.

"Pretext can be proven by *any* evidence that casts doubt on the credence of the employer's proffered justification[s] for the adverse employment action." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) (emphasis added). Bearing this in mind, "in order to survive a motion for summary judgment, a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Id.* at 577 (internal quotation marks and citation omitted). Specifically, a "plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). Importantly, though, we must review the evidence in the

light most favorable to the nonmovant at the summary judgment stage. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). In reviewing all the proffered reasons, it is important to underscore that temporal proximity remains a relevant factor at the pretext stage. *See Brown*, 969 F.3d at 579. This factor is doubly relevant in this case. That is, temporal proximity existed between January's protected activity and his firing. *In addition*, the fact that the outside investigation into January's complaint concluded mere days after his visit to City Hall, after having begun months beforehand, also suggests "suspicious timing" that counsels against summary judgment. *Shackelford*, 190 F.3d at 409; *see also Watkins v. Tregre*, 997 F.3d 275, 285 (5th Cir. 2021) (concluding genuine dispute of material fact existed when "suspicious sequence of events le[d] up to [plaintiff's] firing"). While this factor alone might not be sufficient to satisfy January's pretext burden, it "carr[ies] significant weight" in our review. *Ameristar Airways, Inc. v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 650 F.3d 562, 569 n.21 (5th Cir. 2011). What screams loudly in this arena is that he was fired based upon his alleged conduct *the day he visited City Hall to obtain necessary information to file his EEOC complaint*. Thus, his conduct that day was not wholly unrelated to his protected activities; instead, it was clearly related. It certainly appears that his supervisors were trying to find a way to eliminate him once they knew he was going to sue the City.

To get to the specifics, Huntsville proffered four reasons for January's termination. First, Huntsville cited its investigation, which suggested "that there [was] a high probability" that January was impaired during his visit to City Hall. In that context, it alleged that he "refused the offer of a Horizontal Gaze Nystagmus evaluation and a urinalysis." In response, January argues this reason is unworthy of credence because the video recording of him while he was at City Hall refutes Huntsville's characterization. Additionally, he

notes that Lunsford admitted that he was not on duty at the time such that a standard test for intoxication was not offered.

The majority opinion concludes that this video "does not cast doubt on Lunsford's conclusions and provides no evidence that his conclusion was pretextual." Majority Op. at 13. The majority opinion attempts to discount the video by reducing its significance to only January's "subjective conclusions." *See* Majority Op. at 12–13. In doing so, it ignores the standard of our review—we *must* construe the evidence, including this video, in the light most favorable to January. *See Shackelford*, 190 F.3d at 409; *see also Fairchild v. Coryell Cnty.*, 40 F.4th 359, 363 (5th Cir. 2022) ("As is always true at summary judgment, the facts must be viewed in favor of the nonmovant . . . . Construing the video[] in favor of the plaintiffs shows that a jury could reach different conclusions on a number of facts").

Properly evaluating the evidence here, the video shows that a number of officials asked January about his condition and spoke with him about what *they thought* about his behavior. However, the video also shows that January repeatedly and consistently explained that he was *not* impaired and instead was only experiencing the effects of limited sleep. He remained polite and composed, as opposed to belligerent or intoxicated, despite repeated (and often accusatory) questioning from officials and several tense exchanges between those officials and his wife (once she showed up). Indeed, when asked about a horizontal gaze test being performed on him, January respectfully declined and provided a reasonable explanation: that he had not slept well and was (justifiably) concerned about the circumstances surrounding his disagreements with Huntsville. Reviewing the whole of this video, it is revealing that, while January does speak quickly, Huntsville itself acknowledges that "[t]he video shows January appearing lethargic *but not slurring words*." Importantly, too, given Huntsville's concession that he was not on duty and, therefore, not subject to a standard test for intoxication, at

the very least, it is a fact question whether this is a legitimate basis for firing versus a pretextual one.

Put another way, instead of him being fired due to misconduct while on duty, he was fired for alleged misconduct while seeking materials for his EEOC complaint. Therefore, given the suspicious timing, *see Brown*, 969 F.3d at 579, and viewing the evidence in the light most favorable to January, *see Shackelford*, 190 F.3d at 409, I would conclude that January has adequately disputed this supposed reason of impairment in the form of intoxication for his termination.[1] *See Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002) (concluding that summary judgment was inappropriate where the plaintiff had "provided sufficient evidence to cast doubt on th[e] [employer's] explanation, thereby enabling a reasonable factfinder to conclude that it was false").

Huntsville's second explanation for January's termination was that he was "insubordinate by ignoring responsible officials" who told him to "leave City Hall at least three different times while in the City Manager's office." But this characterization is at odds with what is depicted in the video. In the video, January does not appear to ever ignore any official order for him to leave City Hall. Rather, it was *January* who spontaneously offered, in response to one official's questions, to call his wife to pick him up if it would "make [that official] happy." Indeed, while he was talking during the video, his wife arrived to pick him up, so that is consistent with his willingness to

---

[1] Another point supports this conclusion: the mere fact that the majority opinion draws such markedly different determinations from the aforementioned video than I have made from my review itself underscores why summary judgment was improper—reasonable minds can clearly differ. Further, the video did not come from an incident that was wholly and clearly removed from January's protected activities; rather, as discussed above, it is a video that was taken when January *went to City Hall to get documents relevant to his EEOC complaint*.

leave, not a refusal to do so. It is also difficult to square Lunsford's characterization of January's conduct with the fact that one official expressly suggested that it would be acceptable if *either* an official drove January home *or* his wife picked him up. Put simply, the video recording does not show what Lunsford claims, i.e., that January was "insubordinate" and was "told to leave City Hall," yet refused to do so. January has done more than enough "to cast doubt on this explanation, thereby enabling a reasonable factfinder to conclude that it was false."[2] *Id.* at 348.

Huntsville's third explanation for January's termination was that he harmed its reputation through his "level of impairment, . . . unprofessional conduct, insubordination and unwillingness to cooperate with officials." This explanation is predicated on January having behaved in certain ways. As January points out, and I discuss above and below, whether he did behave in an impaired, unprofessional, or insubordinate manner is contradicted by the video and record evidence. A reasonable factfinder could thus determine that this reason was false. *See id.*; *Brown*, 969 F.3d at 578.

That leaves Huntsville's final explanation for its decision to fire January, which was that January engaged in "disrespectful, unprofessional or disruptive behavior" towards Poe. While January's interactions with Poe were not captured on the video in evidence,[3] Poe did give testimony before the Texas Workforce Commission that is relevant to this issue. Specifically, Poe testified that she felt threatened by January because, for the "[t]hree to

---

[2] In fact, when January was directly told to leave by an official, he promptly did so, saying "yes sir."

[3] While the video recording in evidence does not show Poe, as discussed further below it is worth noting that January *sought* discovery that included "[a] copy of a recording made by Ms. Poe" of January. Of course, the court denied that request. But needless to say, such a recording would have obvious probative value to this matter.

four" minutes she was making copies, January positioned himself in the doorway of the copy machine room and stated something to the effect of, "[w]hen all of this comes out, they're going to be sorry they messed with me." Put in its proper context, and drawing all reasonable inferences in favor of January, Huntsville's proffered reason is highly pretextual.

As Poe acknowledged, it was entirely normal for January to wait in the copy machine room with her while she was making copies. That is what most people do, so there is nothing to support the notion that he was threatening her by doing so. At some point January made his allegedly threatening statement, but, as Poe also admitted, she understood this statement to be directed *at Huntsville*, rather than *herself*. Put another way, he was threatening to sue the City, not to hurt her physically (or otherwise). If telling one of the employees of a company or city that you are going to sue their employer is a threat that allows firing, that would be the opposite of the exact point of the retaliation clause: to preserve the protected activities of employees to file EEOC claims. Indeed, it is revealing that Poe stated that January did not threaten her "personally" before immediately explaining that she was "a part of the [C]ity." So, in sum, what Poe is trying to characterize as threatening—and what Huntsville contorted into a violation of its policies—should be properly construed as normal behavior and an expression of frustration with Huntsville, rather than Poe, which he has a right to have. Simply put, when all reasonable inferences are drawn in January's favor, Huntsville's final explanation rings hollow. *See Shackelford*, 190 F.3d at 409; *Gee*, 289 F.3d at 348. In sum, all of the claimed reasons strongly appear pretextual, so, at a minimum, it is a fact issue.

## II. Rule 56(d)

If I were the only person writing the appellate opinion, I would reverse the summary judgment on the retaliation claim and remand for a trial on the

merits.  But, since the majority opinion concludes that summary judgment was proper on January's retaliation claims on the evidence then in existence in the district court, *see* Majority Op. at 14–15, then I think the majority opinion should have ruled differently on January's appeal of the Rule 56(d) motion denial.  With respect to this motion, the majority opinion determines that January failed to "carry his burden" because he did not demonstrate how the sought-after discovery would "create a genuine issue of material fact."  Majority Op. at 6–7 (quotation omitted).  To receive relief under Rule 56(d), a party must show that (1) "additional discovery will create a genuine issue of material fact," and (2) he "diligently pursued discovery." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 816 (5th Cir. 2017) (quotation omitted).  A "non-moving part[y] requesting Rule 56(d) relief may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (per curiam) (internal quotation marks and citation omitted).  Rather, he is required to "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Id.* (quotation omitted).

Importantly, however, these motions "are broadly favored and should be liberally granted," given that Rule 56(d) "is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Id.* (internal quotation marks and citations omitted).  Thus, "[i]n evaluating district courts' rulings on Rule 56(d) motions, we generally assess[] whether the evidence requested would affect the outcome of a summary judgment motion." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 423 (5th Cir. 2016).  We have found an abuse of discretion as to a Rule 56(d)

motion where "a *specific* piece of evidence . . . would *likely* create a material fact issue." *Id.* (emphasis added).

With regard to the first Rule 56(d) requirement, that January must have shown that "additional discovery will create a genuine issue of material fact," *Jacked Up, L.L.C.*, 854 F.3d at 816 (quotation omitted), January set forth a plausible basis for concluding that certain facts likely exist and suggested how those facts would influence summary judgment, *see Biles*, 714 F.3d at 894 (quotation omitted). In his Rule 56(d) motion, January explained that information he sought through discovery, but did not receive, was "germane to the issues raised in the [summary judgment] motion." In addition, January highlighted his previous attempts to access this discovery, including his March 10 letter to the district court,[4] a follow up email, and a declaration from his counsel about those communications.

This collective context establishes a "plausible basis" for understanding the relevance of the sought-after evidence. *Id.* (quotation omitted). Further, in contrast to cases like *Biles*, where we concluded that sought-after evidence was unlikely to affect the outcome of summary judgment, here it is clear that evidence of Poe's recording and the record of the outside investigation would likely affect summary judgment. *See id.* at 895. Such evidence could discredit Huntsville's characterization of January's conduct or clarify the extent to which Huntsville's leadership was aware of January's discrimination contentions. However one looks at all of the discovery, at least some of the information sought in January's request,

---

[4] In this letter, January elaborated on his request for more discovery as to Poe, stating that "[s]he claim[ed] that she felt threatened." January explained that Poe had been "fired" by Huntsville "because she had made a surreptitious recording of Mr. January" and wrote that he accordingly sought "[a] copy of the recording made by Ms. Poe." This letter further explained that he sought a copy of the file for the outside investigation that was initiated after he "presented a number of complaints, including discrimination issues."

alongside the likely probative value of that evidence, support his satisfaction of the first Rule 56(d) requirement. *See Renfroe v. Parker*, 974 F.3d 594, 601 (5th Cir. 2020).

Turning to the second Rule 56(d) requirement, that January must have "diligently pursued discovery," *Jacked Up, L.L.C.*, 854 F.3d at 816 (quotation omitted), the majority opinion focuses on the fact that the discovery period ended on March 2, 2022, and January's first outreach to the district court regarding the discovery dispute was on March 10, 2022. January then submitted his Rule 56(d) motion in his response to Huntsville's motion for summary judgment approximately two months later.

It's true that we have affirmed a district court's denial of a Rule 56(d) motion where the movant "did not move to compel production of the[] documents during the discovery period." *Id.* However, in that case, we specifically observed that the movant *first* raised the need for additional discovery in its response to a motion for summary judgment. *Id.* But here, January initially raised these discovery disputes *prior* to his response to Huntsville's motion, only days after the discovery period ended. This case is plainly distinguishable, then. *See id.* Moreover, the parties themselves both acknowledged that, as of their joint motion to extend the discovery deadline, they *had* been diligent in their discovery-related efforts.[5]

In sum, it is clear that that we can identify, at minimum, several "specific piece[s] of evidence that would likely create a material fact issue," *Smith*, 827 F.3d at 423, including Poe's purported recording of January and the evidence of the outside investigation. Therefore, and in light of the fact

---

[5] Furthermore, as the majority opinion acknowledges, January sent his letter to the district court in accordance with the court's internal procedures. *See* Majority Op. at 5 n.1.

that Rule 56(d) motions are broadly favored, *see Biles*, 714 F.3d at 894, I would conclude the district court abused its discretion in denying January's motion.

Accordingly, I conclude that the district court erred in granting summary judgment on January's retaliation claims. Given that the majority opinion affirms that, I disagree with its affirmance of the district court's denial of January's Rule 56(d) motion. Therefore, I would reverse and remand for further consideration of these issues.